# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Abt,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>United of Omaha Life Insurance Company,<br><br>　　　　　Defendant. | No. CV-18-01255-PHX-SMM<br><br>**ORDER** |

Pending before the Court is Plaintiff John Abt's Motion for Judgment on the Administrative Record. (Doc. 24.) Defendant United of Omaha Life Insurance Company filed its Response in opposition (Doc. 26), and Plaintiff filed his Reply in support (Doc. 29). After review and consideration, the Court issues the following ruling.

**I.    BACKGROUND**

Plaintiff was employed by DWWWTO, Inc. d/b/a Toyota of Orange ("Toyota") for fourteen years, of which he spent 9 years as Toyota's Business Development Manager. (Docs. 24 at 1-2; 26 at 2.) As an employee of Toyota, Plaintiff participated in Toyota's Employee Retirement Income Security Act of 1974 ("ERISA") governed employee welfare benefit plan (the "Plan"). (Doc. 26 at 2.) The Plan provided short-term disability ("STD") and long-term disability ("LTD") coverage. (Id.) Defendant administered and funded the Plan's STD and LTD benefits. (Id.)

On March 30, 2015, Plaintiff fell while hiking Camelback Mountain and hit his head. (Doc. 22 at 59, 94.) Plaintiff did not lose consciousness and, after ten minutes, was

able to hike down the mountain. (Id. at 94.) According to Plaintiff, he presented at Urgent Care following the accident. (Doc. 24 at 3.) Plaintiff then sought medical treatment from Dr. Diana Mladenoff, a chiropractor at the Concussion Care Center, on April 14, 2015. (Doc. 22 at 90.) He reported experiencing headaches, nausea, brain fog, decreased processing speed, decreased memory, and word-finding difficulties. (Id.) Plaintiff was diagnosed as suffering from post-concussive syndrome. (Id. at 93, 95.)

Following the accident, Plaintiff states that he took three weeks off from work at the suggestion of his supervisor because he was having difficulty performing in his position. (Docs. 24 at 3, 11; 26 at 5.) Upon returning to work, Plaintiff contends that he was demoted from Business Development Manager to a sales position. (Docs. 24 at 3; 26 at 5.) Toyota classified this sales position as a "light" strength job, requiring "20lbs. [m]aximum lifting with frequent lift/carry up to 10 lbs. A job is light if less lifting is involved but significant walking/standing is done or if done mostly sitting but requires push/pull on arm or leg controls." (Doc. 22 at 148.) Plaintiff continued in this position for approximately one year following the accident and maintained a full-time schedule, working between 36.73 and 61.27 hours per week. (Id. at 149-151.) Plaintiff contends, however, that Toyota disciplined him for failing to meet sales quotas and ultimately terminated him because of disability. (Doc. 24 at 12.) Plaintiff's last day of work was May 11, 2016. (Doc. 22 at 154.)

Throughout Plaintiff's employment, he sought medical treatment for his injury from Dr. Mladenoff. (Id. at 106-29.) Beginning on April 15, 2015, Dr. Mladenoff treated Plaintiff for nonallopathic head, cervical, and thoracic lesions, headaches, attention and concentration deficits, muscle spasms, and muscle weakness. (Id. at 106, 109, 112, 114, 119-20, 124-25, 128.) On March 15, 2016, Plaintiff treated with Dr. Mladenoff and reported that he was exhausted after having just worked seven days in a row. (Id. at 123.) Plaintiff also indicated that he was easily irritated. (Id.) Dr. Mladenoff treated Plaintiff with cold laser therapy and neurofeedback training. (Id.) She also administered low level laser therapy to improve brain circulation and decrease Plaintiff's brain fog. (Id.) Dr. Mladenoff provided this treatment to Plaintiff at each appointment. (Id. at 106, 109, 111, 113-14, 118,

120, 123, 125, 127, 129.) Plaintiff treated with Dr. Mladenoff again on March 29, 2016. (Id. at 125.) At that appointment, he stated that he had not realized how "brain fogged" he was at his previous appointment on March 15. (Id.) Plaintiff also stated that, although he had worked five days in a row, he was starting to "get the hang of things at work." (Id.) At an April 12, 2016 appointment, however, Plaintiff stated that he was having difficulty adjusting to his work schedule because his schedule was constantly changing. (Id. at 127.) He also stated that he had just worked seven days in a row and was tired, but not exhausted. (Id.) On April 25, 2016, Plaintiff again stated that he was having difficulty adjusting to his work schedule. (Id. at 129.) He further indicated that he was "struggling with his energy and the number or [*sic*] hours and days that he ha[d] to be there to work efficiently." (Id.) For the first time on April 25, Plaintiff expressed concerns about his daughter's health condition, explaining that the concerns made it difficult to concentrate at work. (Id.) At a May 3, 2016 appointment, Plaintiff stated that, although he had had a great day at work the previous day, he had been preoccupied by a concern for his daughter's health. (Id. at 106.)

Plaintiff continued treatment with Dr. Mladenoff following his last day of work on May 11, 2016. (Id. at 108.) At a May 16, 2016 appointment, Plaintiff indicated that he had not spoken with anyone from work since his last day and stated that he contacted an attorney to help him file for disability. (Id.) He again expressed concerns over his daughter's health condition. (Id.) At a May 19, 2016 appointment, Plaintiff stated that Toyota terminated him for disability and agreed to give him severance and a few months pay. (Id. at 111.) Plaintiff also indicated that he was tired and had been sleeping frequently. (Id.) On May 24, 2016, Plaintiff indicated that he was continuing to work with an attorney to file for disability. (Id. at 113.) However, Plaintiff stated that he was also preparing his resume because he was concerned that he may not qualify for disability. (Id.)

Plaintiff's appointments were documented in Dr. Mladenoff's treatment notes. (Id. at 106-29.) None of Dr. Mladenoff's treatment notes, however, recommended any work-related restrictions for Plaintiff. (See generally id.)

Plaintiff also sought to establish care with Dr. Donald A. Opila, a primary care

physician, during his employment. (Id. at 159-60, 171-73.) Dr. Opila treated Plaintiff once on March 15, 2016 for a traumatic brain injury. (Id. at 159, 172-73.) Dr. Opila performed a physical examination on Plaintiff and found that he was markedly limited in the following areas: following work rules; performing repetitive or short cycle work; performing at a constant pace; maintaining attention and concentration; performing a variety of duties; understanding, remembering, and carrying out complex instructions; attaining set limits and standards; using judgment and making decisions; directing, controlling, or planning activities of others; and influencing people in their opinions, attitudes, and judgments. (Id. at 172.) Dr. Opila also found that Plaintiff had poor concentration, a poor memory, and displayed frustration. (Id.) He further found that Plaintiff could frequently lift and carry 11-25 pounds, frequently kneel and work with others, constantly sit, and occasionally stand and walk. (Id. at 173.) Dr. Opila concluded that Plaintiff was continuously disabled as of March 30, 2016. (Id. at 172.) Dr. Opila also noted that it was "unknown" whether Plaintiff could work with modifications and suggested that Plaintiff "needs [a] regular schedule" because he was not flexible. (Id.)

On May 12, 2016, Plaintiff filed for STD benefits due to a traumatic brain injury. (Id. at 86, 100.) In support of his application, Plaintiff submitted Dr. Mladenoff's treatment notes dated between March 15, 2016 and May 25, 2016, medical records from Dr. Opila including an Attending Physician Statement, laboratory testing dated June 15, 2016, and time sheets dated between March 1, 2016 through May 16, 2016. (Id.)

Defendant referred Plaintiff's medical records to be reviewed by Sara Schmit, a nurse practitioner. (Id. at 210.) Ms. Schmit reviewed the records but did not personally examine Plaintiff. (Id.) After reviewing the medical evidence, Ms. Schmit found that Dr. Opila's restrictions were not supported by the medical evidence and Plaintiff's treatment plan was based on subjective complaints. (Id. at 211.) She noted that Plaintiff had not submitted to a mini mental status examination to test for cognitive impairments. (Id.) Ms. Schmit concluded that the medical evidence did not indicate any physical or cognitive impairments due to Plaintiff's traumatic brain injury that would preclude Plaintiff from

performing his job duties full time. (Id.)

On July 18, 2016, Defendant denied Plaintiff's claim for STD benefits. (Id. at 85-89.) In support, Defendant stated that Plaintiff's medical records indicated that his traumatic brain injury symptoms were stable as of March 15, 2016, Plaintiff worked his normal schedule up until May 11, 2016, and Plaintiff's medical records indicated no significant changes in his condition from his last day worked. (Id. at 87.) Defendant concluded "there is insufficient evidence of a functional impairment from a mental and physical perspective that would preclude you from performing the material duties of your usual occupation from May 11, 2016 forward. Therefore, no benefits are payable, and your claim has been denied." (Id.) Defendant advised Plaintiff that he had the right to appeal the decision and directed Plaintiff:

> If you wish, you may submit your comments and views of the issues, in writing, and any additional documentation, records or other information in support of your appeal. You are encouraged to submit any additional medical records that may be available to support your appeal. Medical records include, but are not limited to: treatment notes, test results, consultation records, therapy notes, etc.

(Id. at 88.)

Plaintiff appealed Defendant's denial through an attorney on September 15, 2016. (Id. at 82-84.) There is no evidence that Plaintiff requested a copy of his claim file in appealing Defendant's denial. In support of his appeal, Plaintiff submitted additional evidence including a report from his treating neurologist, Dr. Gary N. Reese. (Id. at 94.) Plaintiff treated with Dr. Reese on June 14, 2016 as a result of ongoing symptoms following his head trauma. (Id.) Plaintiff reported to Dr. Reese the following symptoms: trouble sleeping, decrease in balance, impaired memory (which Dr. Reese noted was "in recent and remote aspects"), headaches, and episodes in which Plaintiff "spaces off" for about 30 seconds. (Id.) Plaintiff also indicated that his symptoms had remained the same since his injury. (Id.) Dr. Reese performed a neurological examination on Plaintiff, finding that Plaintiff's mental status was alert and oriented, Plaintiff's motor, sensory, and cerebellar systems showed normal results, and Plaintiff walked normally. (Id. at 95.) Dr. Reese also

performed a mini mental status examination on Plaintiff, in which Plaintiff scored a 30. (Id.) Dr. Reese noted that Plaintiff had never had brain image testing and ordered an MRI to test for possible CNS pathology and an EEG to test for possible seizure activity. (Id.) Dr. Reese recommended Plaintiff attend speech therapy for cognitive training. (Id.) He did not, however, recommend any work-related restrictions. (Id. at 94-95.)

Plaintiff also submitted a report dated August 18, 2016 from Dr. Mladenoff in support of his appeal. (Id. at 90.) In the report, Dr. Mladenoff noted that Plaintiff presented to the Concussion Care Center with complaints of headaches, nausea, brain fog, decreased mental processing speed, decreased memory, and difficulty coming up with words in conversations. (Id.) She stated that Plaintiff submitted to an evaluation on May 12, 2016 that included a brain map using QEEG measurements to demonstrate brainwave patterns and a computerized neuropsychological assessment. (Id.) Dr. Mladenoff opined that Plaintiff's test results were "consistent with individuals having sustained head injuries, and consistent with his difficulties in successfully working at Right Toyota." (Id.) She concluded that Plaintiff was "considered dysfunctional in terms of his brainwaves and short term [sic] memory, and such dysfunction is consistent with [Plaintiff's] reported difficulties and can prevent him from performing at work." (Id.)

In further support of his appeal, Plaintiff submitted a report dated August 26, 2016 from his treating speech pathologist, Mandy Mortenson. (Id. at 93.) Ms. Mortenson evaluated Plaintiff on July 26, 2016 for post-concussive syndrome. (Id.) The evaluation results revealed "mild-moderate cognitive-linguistic/language deficits characterized by decreased attention, thought organization, word finding, immediate/delayed recall, and executive functions including planning/organizing information." (Id.) Ms. Mortenson found that Plaintiff's "deficits likely created challenges in [Plaintiff's] ability to successfully complete his prior job responsibilities." (Id.) She recommended that he continue speech therapy to address the listed deficits and receive a full neuropsychological evaluation.[1] (Id.) Ms. Mortenson also stated that "it is not recommended that [Plaintiff]

---

[1] There is no evidence that Plaintiff underwent a neuropsychological evaluation.

- 6 -

attempt to return to his former job responsibilities." (Id.)

Defendant then referred Plaintiff's appeal and newly submitted evidence for review by Dr. Alan Neuren, a neurologist. (Id. at 73-75.) Dr. Neuren did not personally examine Plaintiff. (Id.) In reviewing the medical records, Dr. Neuren found that Plaintiff's head injury was poorly documented and likely mild at most due to the fact that Plaintiff did not lose consciousness when he fell and was able to hike down the mountain. (Id. at 75.) Dr. Neuren noted that Plaintiff's neurological examination with Dr. Reese was normal. (Id.) He also noted that Dr. Reese recommended that Plaintiff obtain an MRI and an EEG, but there was no evidence that Plaintiff completed either test. (Id.) Dr. Neuren also stated that a QEEG was not a valid method of assessing cognition, contending that cognition could only be assessed by a formal neuropsychological assessment. (Id.) Thus, he found that there was no evidence of impaired cognition and concluded that there was insufficient evidence indicating that Plaintiff sustained a significant head injury or supporting impairment. (Id.)

In a letter dated October 5, 2016, Defendant affirmed the denial of Plaintiff's claim. (Id. at 67-71.) Defendant informed Plaintiff that "[a]fter reviewing the information in [the] file, we believe [Plaintiff] would not be restricted from performing the duties of [Plaintiff's] regular job." (Id. at 69.)

Plaintiff filed this ERISA action on April 24, 2018, appealing Defendant's denial of his STD benefits claim. (Doc. 1.) Both parties filed briefs, seeking de novo review of the administrative record and a ruling on Plaintiff's STD claim. (Docs. 24, 26, 29.)

**II.    STANDARD OF REVIEW**

Pursuant to ERISA, a plan participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In addition, ERISA requires an employee benefit plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). The plan must

also "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). ERISA requires a plan administrator to explain to a claimant any "additional information needed" for the claimant to perfect his claim on appeal. 29 C.F.R. § 2560.503-1(f)(3). A "full and fair review" must "take[ ] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). "However, because ERISA grants employers 'large leeway to design disability...plans as they see fit,' full and fair review does not require an administrator to credit evidence that cannot support a disability determination under the plain language of a plan." Peterson v. Fed. Express Corp. Long Term Disability Plan, No. CV-05-1622-PHX-NVW, 2007 WL 1624644, at *25 (D. Ariz. June 4, 2007) (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833, (2003)).

"ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989). However, the standard of review in a case involving denial of benefits is de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits." Id. at 115. Here, the parties have agreed to a de novo standard of review. (Docs. 24 at 2; 26 at 3.)

When a court reviews a denial of benefits de novo, it affords no deference to the decision of the claim's administrator. Muniz v. Amec Constr. Mgmt., Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010). In a trial on the administrative record, a court "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." Kearney v. Standard Ins., 175 F.3d 1084, 1095 (9th Cir. 1999). Nevertheless, the burden rests squarely on the plaintiff to establish total disability. Muniz, 623 F.3d at 1294-96. A plaintiff does not meet this burden by establishing that he has a particular diagnosis; the plaintiff must also prove that the diagnosis precluded him from working. See Vaughn v. Hartford Life &

Accident Ins., 387 F. Supp. 3d 1119, 1126 (D. Or. 2019) (citing Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 879-80 (9th Cir. 2004)).

### III. DISCUSSION

#### A. The Plan

The Plan provides for 26 weeks of STD benefits and LTD benefits thereafter. (Doc. 22 at 16.) The Plan will pay STD benefits if a participant becomes Totally or Partially Disabled due to an Injury or Sickness and will begin paying benefits after a seven-day elimination period has been satisfied. (Id. at 25, 34.)

Pursuant to the terms of the Plan, Total Disability or Totally Disabled means "that because of an Injury or Sickness You are unable to perform, with reasonable continuity, the Substantial and Material Acts necessary to pursue Your Usual Occupation and You are not working in Your Usual Occupation." (Id. at 50.) Usual Occupation means "any employment, business, trade or profession and the Substantial and Material Acts of the occupation You were regularly performing for the Policyholder when the Disability began. Usual occupation includes, but is not limited to, the specific job You performed for the Policyholder." (Id.) Substantial and Material Acts means

> the important tasks, functions and operations generally required from employers from those engaged in Your Usual Occupation, that cannot be reasonably omitted or modified.
>
> In determining what Substantial and Material acts are necessary to pursue Your Usual Occupation, We will first look at the specific duties required by Your job. If You are unable to perform one or more of these duties with reasonable continuity, We will then determine whether those duties are customarily required of other employees engaged in Your Usual Occupation. If any specific material duties required of You by Your job differ from the material duties customarily required of other employees engaged in Your Usual Occupation, We will not consider those duties in determining what Substantial and Material Acts are necessary to pursue Your Usual Occupation.

(Id.)

For Plaintiff to qualify for STD benefits, he must establish that he is Totally Disabled pursuant to the terms of the Plan. See Muniz, 623 F.3d at 1294-96. Thus, Plaintiff

must establish both that he is disabled due to an injury or sickness and that Plaintiff's injury or sickness precluded him from performing the material aspects of his job. See Vaughn, 387 F. Supp. 3d at 1126 (finding that a plaintiff must establish both that he has a diagnosis and that the diagnosis prevents him from performing the material aspects of his job).

## B. The Court will Remand this Matter to Further Develop the Record

Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff appeals Defendant's denial of his claim for STD benefits, contending that he established that he is Totally Disabled under the terms of the Plan. (Doc. 24 at 3, 7, 10.) Plaintiff argues that the evidence submitted establishes that he was disabled based on his traumatic brain injury. (Id. at 3.) Specifically, Plaintiff states that evidence of his work history – i.e., demotion, discipline, and subsequent termination – and the medical evidence establish that his post-concussive syndrome impaired his ability to function in his occupation. (Id. at 3-7; Doc. 29 at 2.) In opposition, Defendant contends that Plaintiff failed to establish that he has functional impairments that prevent him from working in his occupation. (Doc. 26 at 2.) Accordingly, Defendant contends that the Court must deny Plaintiff's request for benefits. (Id. at 17.)

For the reasons that follow, the Court finds that this matter is inconclusive in several material aspects that precludes the Court from either affirming or denying the administrative record. While there is evidence that Plaintiff suffered deficits following his accident, the record is lacking in evidence that goes to the Court's decision-making function, certainly by Plaintiff but also by Defendant, that would allow the Court to determine whether Plaintiff's apparent deficits simply impaired his ability to work or precluded altogether his ability to perform the material aspects of his job such that he would be Totally Disabled under the Plan.

First, Plaintiff argues that his deficits precluded him from performing the material aspects of his job as a sales person. (Doc. 24 at 6-7.) However, because Plaintiff failed to provide a job description for his position as Toyota's Business Development Manager or as a sales person, the Court is unable to ascertain whether Plaintiff's deficits would preclude him from performing the substantial and material aspects of his job. In support of

his claim for STD benefits, Plaintiff provided Toyota's Employer Statement that listed Plaintiff's position as "sales" and indicated that it was a "light" strength position. (Doc. 22 at 148.) Toyota left blank the portion of the Employer Statement that requested a "[d]escription of major job duties" and directed the employer to "attach job description." (Id.) Moreover, Plaintiff failed to supplement Toyota's Employer Statement with this information. Thus, the Court cannot ascertain the substantial and material aspects of Plaintiff's job. Nor can the Court assess whether Plaintiff's impairments would preclude him from performing the substantial and material aspects of his job.

Plaintiff also contends that his demotion, disciplinary action, and subsequent termination sufficiently establish that his post-concussive syndrome impaired his ability to function in his occupation. (Docs. 24 at 2; 29 at 2.) However, the Court notes that Plaintiff failed to provide any objective evidence that corroborates these assertions. Instead, Plaintiff's assertions are based entirely on self-reported statements. For example, in support of the assertion that Plaintiff was terminated because he failed to meet sales quotas, Plaintiff cites to a letter from his administrative appeal attorney in which his attorney reiterates Plaintiff's contention that he was terminated for "failure to perform at a minimum standard." (Doc. 29 at 3 (citing (Doc. 22 at 83)).) Plaintiff also cites to Toyota's Employer Statement to support this proposition; yet, Toyota's Employer Statement fails to mention the reason for Plaintiff's termination. (Id. (citing (Doc. 22 at 148)).) Thus, Plaintiff fails to submit any objective evidence from either Toyota or Plaintiff's supervisor, corroborating Plaintiff's assertions that he was demoted, disciplined, and terminated because of his post-concussive syndrome. Without this evidence, the Court cannot adequately and objectively assess whether Plaintiff's deficits impacted his ability to perform the essential functions of his job.

Plaintiff further argues that the medical evidence establishes that he was disabled because his treating physicians diagnosed him with post-concussive syndrome. (Doc. 24 at 3.) While Plaintiff's medical evidence demonstrates that Plaintiff suffered from impairments due to post-concussive syndrome, the Court finds that there is a lack of

evidence establishing that Plaintiff's impairments precluded him from performing the essential functions of his job altogether. See Vaughn, 387 F. Supp. 3d at 1126 (finding that a plaintiff must establish both that he has a diagnosis and that the diagnosis prevents him from performing the material aspects of his job).

For example, Plaintiff relies on Dr. Opila's Attending Physician Statement in support of the proposition that he was disabled due to post-concussive syndrome. (Doc. 24 at 4-5.) Upon examination, Dr. Opila found that Plaintiff was markedly limited in a number of capacities, noting that Plaintiff suffered from poor concentration and memory loss, and concluded that Plaintiff was continuously disabled as of March 30, 2016. (Doc. 22 at 172.) However, it is unclear how Dr. Opila arrived at this conclusion. Dr. Opila failed to explain the severity of Plaintiff's impairments, the affect those impairments have on Plaintiff, if any, and whether the impairments would preclude Plaintiff from performing the material functions of his job. Moreover, Dr. Opila's conclusion that Plaintiff was disabled is inconsistent with other remarks found on his Attending Physician Statement. While Dr. Opila opined that Plaintiff was disabled, Dr. Opila also noted that it was "unknown" whether Plaintiff was able to work with modifications. In fact, Dr. Opila noted that Plaintiff required a regular work schedule because he was inflexible, suggesting that Plaintiff may be able to work with modifications. (Id.) Accordingly, the Court affords less weight to Dr. Opila's conclusion because of this inconsistency and finds that Dr. Opila's opinion does not aid in the Court's ruling on Plaintiff's STD claim because it is unclear how Dr. Opila arrived at the conclusion that Plaintiff was disabled.

Plaintiff also relies on Dr. Mladenoff's treatment notes and report in support of his assertion that he was disabled due to post-concussive syndrome. (Doc. 24 at 3-4.) Dr. Mladenoff performed a QEEG on Plaintiff, opining that the results were consistent with an individual having sustained a head injury and "consistent with [Plaintiff's] difficulties in successfully working at Right Toyota." (Doc. 22 at 90.) She concluded that Plaintiff was "considered dysfunctional in terms of his brainwaves" which "can prevent him from performing at work." (Id.) However, Dr. Mladenoff's summary conclusion that Plaintiff

was "dysfunctional" does not equate to Plaintiff being Totally Disabled under the terms of the Plan. Dr. Mladenoff did not explicitly find that Plaintiff could not perform the essential functions of his job. Instead, Dr. Mladenoff stated that Plaintiff's impairments "can" prevent him from "successfully" completing his job. However, the Plan requires more to establish Total Disability. Thus, the Court finds that Dr. Mladenoff's conclusions are insufficient to establish that Plaintiff's impairments prevented him from performing the essential functions of his job.

Plaintiff further relies on Ms. Mortenson's report to establish his disability. (Doc. 24 at 5-6.) Ms. Mortenson found that Plaintiff suffered from a number of cognitive deficits and concluded that these deficits created challenges in Plaintiff's ability to successfully complete his job responsibilities. (Doc. 22 at 93.) As a result, she recommended that Plaintiff not return to work. (Id.) The Court finds that Ms. Mortenson's opinion is rendered in a conclusory fashion because she failed to explain how Plaintiff's cognitive deficits impair his ability to work. For example, it is unclear whether Plaintiff's deficits presented challenges in his ability to complete the essential functions of his job or precluded Plaintiff from performing those functions altogether. Moreover, similar to Dr. Mladenoff's conclusion, Ms. Mortenson concludes that Plaintiff's deficits likely "created challenges" in his ability to "successfully" complete his job. These qualified statements, however, are insufficient to establish Total Disability under the Plan.

Therefore, while Plaintiff presented evidence from Dr. Opila, Dr. Mladenoff, and Ms. Mortenson establishing that he suffered impairments due to post-concussive syndrome, the Court finds that there is a lack of evidence that would allow the Court to assess whether Plaintiff's impairments precluded him from performing the substantial and material functions of his job. Accordingly, the Court can neither affirm nor deny the administrative record.

Plaintiff next contends that this matter should be remanded due to various procedural errors at the administrative level. (Doc. 24 at 12-18.) Plaintiff first argues that Defendants erred in foregoing an in-person medical examination of Plaintiff in favor of a

paper review of his file. (Id. at 15.) While a plan's failure to conduct an in-person examination of a claimant can "raise [ ] questions about the thoroughness and accuracy of the benefits determination," the Ninth Circuit does not require an in-person review. Montour v. Hartford Life & Acc. Ins., 588 F.3d 623, 634 (9th Cir. 2009) (internal quotations and citation omitted); see also Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 676 (9th Cir. 2011) (finding "[a]n insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits"). Thus, Plaintiff's argument fails.

Plaintiff also argues that Defendant erred because he was denied a "full and fair review" at the administrative level. (Doc. 24 at 12-15.) Specifically, Plaintiff contends that Defendant's denial letters were vague because the letters failed to explain the reason for Defendant's denial and failed to describe the evidence necessary for Plaintiff to perfect his claim. (Id.) The Court agrees with Plaintiff.[2] Upon denial of a claim for benefits, ERISA requires a plan administrator to explain to a claimant any "additional information needed" for the claimant to perfect his claim on appeal. See 29 C.F.R. § 2560.503-1(f)(3). In denying Plaintiff's claim, Defendant reasoned that there was "insufficient evidence" of an impairment that would preclude Plaintiff from performing his job and advised Plaintiff that he could submit additional "medical records" if he wished to appeal Defendant's denial. However, Defendant failed to describe any additional evidence necessary for Plaintiff to perfect his claim. This vague denial was insufficient to afford Plaintiff a full and fair review. See, e.g., Salomaa, 642 F.3d at 676, 679 (finding plan administrator failed to describe in plain language the additional information needed to perfect plaintiff's claim where denial was based on lack of medical evidence); see also Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 870 (9th Cir. 2008) (same). After reviewing the administrative record, the Court finds that the plan administrator could have advised

---

[2] However, the Court also notes that Plaintiff was provided an opportunity to more fully develop the record on his administrative appeal. For example, Dr. Reese recommended Plaintiff undergo an MRI and an EEG. (Doc. 22 at 95.) Although Plaintiff had the opportunity to submit to these examinations prior to his appeal, there is no evidence that Plaintiff underwent either examination. Nonetheless, because Plaintiff was denied a full and fair review, the Court will remand the matter.

Plaintiff to provide the following information: a job description of Toyota's Business Development Manager position and sales position; Plaintiff's personnel record; statements from his employer, corroborating the reason for Plaintiff's demotion, discipline, and termination; and medical opinions opining about the extent and severity of Plaintiff's impairments and whether Plaintiff's impairments would preclude him from performing certain functions of his job. Thus, because Defendant failed to identify any evidence for Plaintiff to submit to perfect his claim, the Court finds that Plaintiff was not provided a full and fair review at the administrative level.

In conclusion, although there is insufficient evidence for the Court to find Plaintiff Totally Disabled under the terms of the Plan, the Court will remand this matter for further proceedings because Plaintiff was denied a full and fair review at the administrative level.

## IV. CONCLUSION

Based on the foregoing,

**IT IS HEREBY ORDERED denying** Plaintiff's Motion for Judgment on the Administrative Record. (Doc. 24.)

**IT IS FURTHER ORDERED vacating** Defendant's denial of Plaintiff's claim for short-term disability benefits and **remanding** this matter for further administrative proceedings as set forth in this Order.

Dated this 3rd day of October, 2019.

_____
Honorable Stephen M. McNamee
Senior United States District Judge